ROBERT L. LEACH, State Superintendent of Banking, Appellant,
v. IOWA STATE BANK OF ATLANTIC, Appellee; F. M.
ALEXANDER, Intervener, Appellee; L. A. AN-
DREW, Receiver, Appellant.

TRUSTS: Deposit of Bonds—Mutual Understanding. The deposit in a
1   bank of specifically identified bonds with the mutual understanding
between the depositor and the officers of the bank that the identical
bonds will be returned on demand creates a trust, even though the
bank carried said bonds as a part of its assets and liabilities.

TRUSTS: Subject-Matter—Reinstating Trust After Wrongful Dissipa-
2   tion. A trust which has been inadvertently or wrongfully converted
and dissipated by the trustee to his own use is effectually reinstated
by the subsequent act of the trustee, while solvent, in repurchasing
with his own funds the subject-matter of said trust, with the specific
intent to effect such reinstatement.

TRUSTS: Subject-Matter—Wrongful Hypothecation—Effect. A trust
3   is not affected by the fact that the insolvent trustee, without the
knowledge of the beneficiary of the trust, has wrongfully pledged
the subject-matter of the trust and other securities of his own as
collateral to his personal debt, and by the fact that the subject-matter
of the trust has been actually sold by the collateral holder with the
consent of the insolvent's receiver, when the receiver had *unhamp-
ered opportunity to direct the sale of the insolvent's personally
owned collateral (which was ample), and thus save and protect the
subject-matter of the trust.*

Headnote 1: 7 C. J. pp. 630, 751.  Headnote 2: 7 C. J. p. 752 (Anno.)
Headnote 3: 7 C. J. p. 752 (Anno.)

*Appeal from Cass District Court.*—W. C. RATCLIFF, Judge.

DECEMBER 14, 1926.

The issues in this case were made by intervention in a re-
ceivership proceeding against the Iowa State Bank of Atlantic.
The claimant, F. M. Alexander, filed a petition of intervention,
asking to establish a trust and to impress the same upon the
proceeds of certain Liberty bonds owned by Alexander, as trus-
tee. The defense is that the deposit of the bonds was made as a
general deposit, and a certificate of deposit was accepted in lieu

thereof, and that the claimant is not entitled to any other prefer-
ence than that of a general depositor. The decree established
the trust, and awarded preference for the proceeds in the hands
of the receiver. From such order the receiver has appealed.—
*Affirmed.*

*Ben J. Gibson,* Attorney-general, and *Swan, Martin, Martin
& Kringel,* for appellants.

*J. B. Rockafellow* and *Dalton & Knop,* for appellee.

EVANS, J.—The claimant, Alexander, on and before the ini-
tial transaction here in controversy, was a trustee of a fund of
$5,900. He sought a secure investment for it, and made applica-
tion through the Iowa State Bank for Victory bonds at 4¾ per
cent interest, for the purpose of such investment. These bonds
were acquired for him by the bank, and were definitely identified
by numbers, and were delivered to him. He thereupon, on June
20, 1919, deposited the same with the bank for safe-keeping, as
he contends. The bank issued to him the following receipt:

"United States Bond Certificate of Deposit. Iowa State
Bank, Atlantic, Iowa, June 20, 1919. This certifies that F. M.
Alexander, trustee, has deposited in this bank five thousand nine
hundred and no one-hundredths dollars, par value, in United
States Fifth Victory Liberty Loan four and three quarters
Coupon Bonds, returnable to him or to his order at this bank on
surrender of this certificate properly endorsed. Interest pay-
able hereon from May 20th, 1919, at same rate and tenor as
provided in such bonds."

At the expiration of six months, this receipt was taken up,
and another receipt of the same tenor was delivered. The same
thing occurred six months still later, which was in June, 1920.
After this date, there was no change of receipt until in the year
1923. On July 17, 1920, the bonds were used with others owned
by the bank, and sent to the First National Bank of Chicago, as
collateral to a loan. This bank was the correspondent bank of
the Iowa State Bank. On October 28, 1920, the Iowa State Bank
directed the First National Bank of Chicago to select $6,000 of
its Victory bonds and sell the same. Pursuant to this direction,
these particular bonds were sold, and the proceeds thereof were

placed to the credit of the Iowa State Bank by its correspondent bank. The claimant, Alexander, had no knowledge of these later transactions. He continued to receive his interest regularly from the bank. In May, 1923, the United States government having issued its call for the retirement of these bonds, Alexander requested the Iowa State Bank to convert those held by him into United States treasury notes at the same interest, and this was assented to by the bank. The then cashier wrote the First National Bank of Chicago, supposing the bonds to be there, and directed the conversion to be made. The First National Bank replied that it had no such bonds. The cashier, Welton, was not then able to explain such disappearance. He proceeded, however, to remedy the same, and assured the claimant that he would do so. He wrote to the First National Bank, directing it to purchase for the account of the Iowa State Bank $5,900 of United States treasury notes, and at the same time to sell a like amount of the Victory bonds belonging to the Iowa State Bank and held by the First National Bank as partial collateral. The First National Bank executed this order, and advised the Iowa State Bank of its purchase of the treasury notes, and specified a description of each by appropriate numbers. It also advised the Iowa State Bank that it had made itself the purchaser of $5,900 of the bank's Victory bonds. Thereupon, Welton, as cashier, took up the claimant's receipt for the Victory bonds, and issued another in like form, covering the treasury notes. This receipt was issued and delivered to the claimant in June, 1923. These treasury notes remained in the hands of the First National Bank at all times thereafter, as a part of its collateral, but otherwise subject to the order and control of the Iowa State Bank until it closed its doors, and subject to the order and direction of the receiver thereafter. The First National Bank did not know that any of the bonds were impressed with a trust in favor of the claimant. The Iowa State Bank closed January 8, 1924. At such time, the First National Bank held its obligation for $36,000, and held collateral as security for a much larger sum. The collateral which it held, exclusive of the claimant's treasury bonds, was much more than sufficient to extinguish the debt. Sometime thereafter, the First National Bank requested direction and advice from the receiver upon its suggestion that the bonds on hand be sold. The receiver confirmed the suggestion of

sale, and the bonds were accordingly sold, and placed to the credit of the Iowa State Bank, and applied upon its obligation. The First National Bank returned to the receiver the extinguished obligation to the amount of $36,000, and $22,000 of collateral which it held. This collateral was good and collectible, and more than $15,000 had been collected thereon by the receiver up to the time of the trial in the district court. The proceeds of the sale of the original bonds in October, 1920, were credited to the account of the Iowa State Bank, with the First National Bank, its correspondent. It does not appear that such account was ever depleted below the sum of $5,900. On January 8, 1924, the date of closing, the Iowa State Bank had a credit in such account for more than $6,400. It had cash in its own vault of more than $7,000, and available cash from all sources on that date for more than $19,000.

The foregoing statement of the salient facts is of itself suggestive of the contentions and counter contentions of the parties. The receiver's contentions are:

(1)    That the deposit of the bonds created no trust.

(2)    That, if otherwise, the trust was dissipated in October, 1920, and its proceeds have not been traced.

(3)    That the transaction of June, 1923, in the substitution of the treasury notes for the original bonds, did not create a trust, for the same reason that the first deposit did not create such trust, and for the further reason that neither the claimant nor the Iowa State Bank ever had such treasury notes, and that the same remained at all times in the possession of the First National Bank, as collateral security for its obligation.

(4)    That the proceeds of the treasury notes never came into the hands of the receiver, but were appropriated by the First National Bank.

The counter contentions of the claimant negative all the foregoing propositions.

Preliminary to the discussion, it should be further stated that the claimant, Alexander, transacted his business from June, 1919, to June, 1923, with three successive cashiers of the Iowa State Bank: Patrick, Butzloff, and Welton. The original transactions were had with Patrick, who was succeeded by Butzloff. Butzloff was cashier in October, 1920, when the bonds were sent to the First National Bank of Chicago. Welton was cashier in

June, 1923, when the treasury notes were acquired, in lieu of the Victory bonds.

I. The first question presented is: Was the original deposit a special deposit or bailment, or was it a general deposit, returnable only in kind? The form of the receipt issued by the bank is somewhat noncommittal on that question. The claimant testified that he requested that the deposit be accepted for safe-keeping only; and that at no time had he ever intended to part with the title to the particular bonds. Patrick, the cashier, testified that such was his understanding. While he was cashier, the bonds were thus kept, as the bonds of Alexander. This does not mean, however, that the books of the bank indicated anything of that kind. On the contrary, the books of the bank included them in its assets, and included the receipts for them in its liabilities. They were in fact actually held as the property of Alexander. We have held in such cases that the method of bookkeeping adopted by the bank is not of controlling importance. *Hudspeth v. Union Tr. & Sav. Bank*, 196 Iowa 705; *First Nat. Bank v. Propp*, 198 Iowa 809. The evidence of Alexander at this point is wholly consistent with all the circumstances attending his acquisition of the bonds. He was seeking a secure investment for his ward. He made application for the purchase of the bonds for that purpose alone. What would it avail him to acquire government bonds for the security of his ward, if he were to use them simply as a general deposit in a bank, and thereby to exchange them for a mere certificate of deposit? If he were willing to accept the mere certificate of deposit of a bank as an adequate security for the protection of his ward, he could have secured that by depositing the funds. He could have no occasion whatever for desiring to purchase the bonds. We are firmly convinced, upon the record, therefore, that Alexander had no other purpose than to deposit his bonds for safe-keeping. We are likewise convinced that the bank official who received the same understood the nature of the deposit in the same way. A trust, therefore, was originally created.

II. What was the effect of the conversion of the bonds in October, 1920? Perhaps it ought to be said that they were converted in July, when they were sent in as collateral. It appears

1. TRUSTS: deposit of bonds: mutual understanding.

from the evidence that the bank had a consider-
able number of these bonds of its own. Those
of the claimant may have been included by in-
advertence. For the purpose of this case, it
does not matter whether it was done inadvertently or by evil
intent. In either case, the claimant had a right to pursue the
proceeds. He could have impressed a trust upon the fund to the
credit of the Iowa State Bank in the First National Bank. To
that extent, the funds were clearly traced. The burden of prov-
ing dissipation would be upon the Iowa State Bank and upon its
receiver. No proof of that kind was offered. So far as appears,
upon this record, the fund to the credit of the Iowa State Bank
in its correspondent bank was never depleted to a point below
the proceeds of these bonds. In view of the fact, however, that
this fund, which amounted to more than $6,400 on January 8th,
was later appropriated by the correspondent bank to the pay-
ment of its obligation, it may be true that such fund would have
to be regarded as dissipated, and as not having come into the
possession of the receiver. We have no occasion to wrestle with
that question, and we leave it, and turn to the event of June,
1923, when the treasury notes were substituted. On that date,
the claimant had no practical recourse in equity except as against
the proceeds of the sale of the bonds, as traced into the fund in
the First National Bank. The Iowa State Bank, then a going
concern, recognized his right and title to the original bonds and
his right and title to the proceeds thereof, and proceeded to
remedy the wrong which it had done. It purported to acquire
for him the treasury notes, theoretically with the very proceeds
which had been realized therefrom. True, it substituted its own
Victory bonds for the purpose of acquiring the treasury notes.
It appears from the evidence that, in October, 1920, when the
bonds of the claimant were sold by the Chicago bank, such bank
held $12,000 of such bonds, which it had received from the Iowa
State Bank. The direction to the First National Bank to sell
$6,000 worth of the bonds did not specify any selection. If,
therefore, it had so happened that the First National Bank had
sold the $6,000 worth of the bonds which belonged to the Iowa
State Bank, no harm would have resulted to the claimant. To
put the matter most charitably to the then managing officer of
the Iowa State Bank, he acted through mistake, and was person-

2. Trusts: sub-
ject-matter:
reinstating trust
after wrongful
dissipation.

ally unaware of the rights of the claimant. Was it competent for the bank, through its proper officer, in June, 1923, to rectify such mistake by devoting an equal amount of its own bonds to the purchase of treasury notes for the plaintiff? We see no possible objection to the validity of such a transaction. It was the duty of the bank to remedy the wrong. The method adopted by it did nothing more than afford such a remedy. It did purchase the treasury notes, and purchased the same for the claimant, and it issued its receipt therefor in precisely the same form as it had receipted for the original bonds. This was a clear recognition of the title of the claimant to the treasury notes, and was binding upon both parties. As between them, therefore, the bank became chargeable with the custody of the treasury notes, and also bound to deliver them upon demand.

What was the legal effect upon this trust relation of the fact that these treasury notes were incumbered in title by the rights of the First National Bank? This incumbrance was not known to Alexander. It was still the duty of the Iowa State Bank to protect its trust, as far as it could, by first applying upon its obligation the collateral which belonged to itself. It may be conceded, for the purpose of the argument, that, if the collateral held by the First National Bank, including these bonds, was no more than sufficient to extinguish the debt, then the bonds and the proceeds would be wholly dissipated, so far as the receiver was concerned. He could properly say that he had never received them. Such is not the case before us. As already indicated, the collateral which belonged to the bank, exclusive of these bonds, was abundant to discharge the obligation for which they were held. The First National Bank declared no forfeiture, nor resorted to any legal process, nor threatened any. While it protected its right to the security of its collateral, it freely abided the direction of the receiver as to what collateral should be devoted to the payment of the obligation. It had no knowledge of the outstanding equity of the claimant. In its correspondence with the receiver, it recognized his right and title to all the collateral, subject only to the payment of its obligations. As already stated, it restored to the receiver more than $22,000 worth of such collateral; whereas $5,900 of it, at least, should have been devoted to the

*3. TRUSTS: subject-matter: wrongful hypothecation: effect.*

payment of its obligation, in lieu of the claimant's bonds. We are not directly concerned with this later conversion. It is sufficient for the claimant to show that these bonds came into the possession or control of the receiver. It is clear, upon this record, that the receiver had such control of these bonds that he could have fully protected them by a mere request to the First National Bank that the other collateral be first applied to the payment of its obligation. He was under the same obligation to pursue that course as the Iowa State Bank would have been, if it had been still a going concern. The claimant himself would have been entitled to enforce such equitable relief, even as against the First National Bank, if he had known of the wrong and had attempted to protect himself. But the First National Bank interposed no obstacle in the way of such course, but appears at all times to have been acquiescent to the wishes of the receiver as to the method of handling the collateral. In a constructive sense, therefore, and indeed in every equitable sense, these treasury notes did come into the hands of the receiver, and would augment the value of the estate coming into his hands by just the amount for which they were sold. This was shown to be about $6,100.

The trial court properly allowed the preference to the extent of the proceeds realized by the receiver from such bonds.— *Affirmed.*

All the justices concur.