ROBERT L. LEACH, State Superintendent of Banking, Appellee, v. SANBORN STATE BANK, Appellee, et al., Appellants.

**BANKS AND BANKING**: Insolvency—Preference Under Trust—Overthrowing Presumption. Even though a trust relation is clearly established in relation to the deposit of government bonds with a bank as a bailment, yet the receiver of such insolvent bank may defeat a plea of preference in payment by showing that, prior to his appointment, the bank had wholly dissipated the bailment, and that, therefore, no part of the same came in any form into his possession.

Headnote 1:    7 C. J. p. 752.

Headnote 1:    1 L. R. A. (N. S.) 252.

*Appeal from O'Brien District Court.*—C. C. BRADLEY, Judge.

MARCH 15, 1927.

Claimants, by petitions of intervention filed in the receivership of the Sanborn State Bank, insolvent, seek to establish their claims as preferred. The facts were stipulated. The trial court denied the preference in each instance, but gave the interveners the standing of general creditors. Claimants appeal.—*Affirmed.*

*A. T. Fillenwarth* and *Herrick & Herrick,* for appellants.

*Ben J. Gibson,* Attorney-general, and *O. H. Montzheimer,* for appellee.

DE GRAFF, J.—The claimants are owners of government bonds, left with the defendant Sanborn State Bank for safe-keeping. These bonds were wrongfully converted by the bank.

Are the claimants entitled to a decree for preferential payment on a trust theory? It is beyond dispute that the bonds in question were held under a contract of bailment, which constituted an express trust. The bonds are now gone, and the record discloses that the receiver never had possession of them. In fact, the Sanborn bank lost control of these bonds during the year 1920. They were either sold or hypothecated by the Sanborn bank, in violation of its legal duty to these claimants.

The facts in this case were stipulated by the parties hereto, and it is stipulated by and between all the parties that, on December 17, 1919, the Sanborn State Bank, of Sanborn, Iowa, by W. A. Solon, its cashier, sent the claimants a letter, in which it was said that, by reason of numerous holdups and robberies of banks, and in particular, the looting of safety-deposit boxes by "yeggs," the bank would no longer be responsible for the contents of safety-deposit boxes, and that Liberty bonds left "in your box will be at your own risk;" that, upon the approval of the bank examiner, "we have devised a scheme to give full protection to our patrons;" and that "the plan will be explained if you will call at our bank." This plan involved the sending of the bonds on deposit to a Chicago bank for safe-keeping.

The claimants, complying with the letter and plan, shortly thereafter left with the Sanborn Bank for safe-keeping certain Liberty bonds, in the denominations and amounts as set forth in their respective petitions, and received therefor a receipt or "bond certificate" from the bank, to wit:

"$........                    Bond Certificate          No........
                          "Sanborn State Bank
                               "72 - 562
                                        "Sanborn, Iowa,........

"This certificate that......has deposited in this bank in United States......Liberty Loan 4½ per cent Coupon Bonds, returnable to him or his order on ten days' notice and upon return of this receipt properly endorsed.

"Interest payable hereon at the same rate of interest as above described bonds now draw and at such time as interest is payable on said bond.

"Interest due in.....................
............Cashier."

It is further stipulated that, within a few days after the receipt of said liberty bonds by the bank, the bonds were sent to the Corn Exchange National Bank of Chicago, for safe-keeping, and that none of said claimants have ever received back said Liberty bonds or bonds of like denomination either from the Chicago bank, the Sanborn bank, or the receiver, nor have they received the equivalent in cash therefor.

It is further stipulated that, at the time the bonds of the claimants were sent to Chicago for safe-keeping, there was also a large amount of other Liberty bonds sent to Chicago, under like conditions; that thereafter, upon advice from the Sanborn State Bank and its officers, various portions of the bonds so left with the Chicago bank for safe-keeping were, during the year 1920 and thereafter, sold, and the proceeds credited to the account of the Sanborn State Bank in said Chicago bank, and the proceeds therefrom used by the Sanborn bank, and all of said bonds not so sold were pledged to secure the payment of indebtedness of the Sanborn bank existing at said time, and thereafter all of said bonds were either so sold or pledged as collateral; that of all bonds so pledged in 1920, there was on hand with the Chicago bank, unsold and held as collateral for

the indebtedness of the Sanborn bank, the sum of $8,642.89 on
the 17th day of July, 1924, the date of closing of the Sanborn
State Bank; that, on the 18th day of July, 1924, said bonds
were sold by the Chicago bank, and the proceeds ($8,642.89)
applied on the indebtedness of the Sanborn bank to the Chi-
ago bank.

It is further stipulated that never at any time since the
deposit of said original bonds with the Sanborn bank for safe-
keeping did the claimants herein give their consent for the
pledging of said bonds for any indebtedness of the said Sanborn
State Bank, nor had they any knowledge that the bonds had been
so pledged, nor did the Chicago bank know that any of these
bonds belonged to claimants; that, during the time of the deposits
of said bonds with the Sanborn State Bank, the interest thereon
was paid to the owners; that, upon the payment of each of said
interest payments, new ''bond certificates'' were issued by the
Sanborn bank to the owners of said bonds, which certificates
were similar to the ones previously held, but bore a new date;
that the total amount of claims filed for Liberty bonds is $4,150.

It is further stipulated that, on November 24, 1919, the
Sanborn State Bank sent to the Corn Exchange National Bank
of Chicago Liberty bonds of the par value of $11,500, which
bonds were similar to the bonds of the claimants herein, except
that they differ as to serial number; that, on December 19, 1919,
the Sanborn bank sent to the Chicago bank for safe-keeping
similar Liberty bonds, of the par value of $12,850, and that
these two shipments of Liberty bonds held by the Chicago bank
for safe-keeping were afterwards handled exactly the same as
the bonds of these claimants which had been sent in for safe-
keeping; that during the year 1920 they were removed from safe-
keeping, and some of them were sold, and the proceeds credited
by the Chicago bank to the account of the Sanborn State Bank,
and some of them taken from safe-keeping by the Chicago bank
and placed in the collateral department, as collateral security
to loans to the Sanborn State Bank; and that there is no record
in the receivership or within the knowledge of the receiver
identifying these bonds as to their serial number, or to determine
whether the bonds that were finally in the hands of the Chicago
bank on the 18th day of July, 1924, and by them sold, were
bonds that originally came out of those owned by the Sanborn

State Bank, or whether they included the bonds owned and deposited with the Sanborn bank by the claimants herein.

It is further stipulated that, on the date that the Sanborn State Bank finally closed its doors (July 17, 1924), and at the time the receiver took charge of said bank, the condition of said bank, as shown by its books, was as follows:

Cash on hand.......................... $4,586.93

Cash to the credit of the Sanborn State Bank in the Corn Exchange National Bank............................................. 850.30

It is further stipulated that said sum with the Chicago bank was by it applied, on July 18, 1924, on indebtedness owed to it by the Sanborn bank, and that said sum of $850.30 did not reach the receiver or come into possession of the receiver; that the account of the Sanborn State Bank was overdrawn in the banks as follows: First National Bank, Council Bluffs, $31.80; Security National Bank, Sioux City, $323.76; Security National Bank, Charles City, $181.02.

It was also agreed that a certain exhibit constituted a correct list of loans made by the Sanborn State Bank on its funds between the dates July 1, 1920, and July 17, 1924, all of which notes have been proved to be worthless, and a loss to the bank in the aggregate of $96,497.95.

It is further stipulated that the claim of the county treasurer of O'Brien County in the sum of $20,879.42 had been filed prior to the instant claims, and that the same, on the 19th day of November, 1924, had been allowed and established as a preferred claim.

It is further stipulated that the balance of the notes in the hands of the Chicago bank on the date of closing have since been redeemed by the Sanborn bank, or paid by the makers to the Chicago bank direct, and the Sanborn bank credited thereon, and the balance of said notes returned to the receiver of the Sanborn bank; that all rediscount notes and bills payable with correspondent banks at the time of the closing of the Sanborn bank and held by correspondent banks as collateral have been redeemed or paid off, and the accounts of the correspondent banks settled, and the balance of said notes returned

to the receiver of the Sanborn bank, all of which has been done since the closing of said bank.

It was further stipulated that the Sanborn State Bank was insolvent at the time of the appointment of a receiver, and is now insolvent, and that the receiver will not be able to pay more than 50 per cent of the depositors' claims against the bank.

It is further shown that the notes given by the Sanborn State Bank to the Corn Exchange National Bank were renewed, from time to time, and the customers' notes from the Sanborn State Bank were sent as collateral security, and that at the time the Sanborn bank closed its doors, it still owed $20,000 to the Chicago bank, secured by Liberty bonds ($8,642.89) and customers' notes also held as collateral, to the amount of $20,000.

It is quite apparent, fron a study of the condition of this bank for a period of $4\frac{1}{2}$ years intervening from the time of the deposits of the bonds of these claimants to the closing of the bank, that there was a great depletion of the assets of the bank. It was a financial toboggan slide for the Sanborn bank. It is also apparent that the record does not show the separate disposition of these two classes of bonds by the Chicago bank. The fact stands, however, that the Sanborn bank lost control of the bonds during the year 1920.

There is but one primary question to be determined. Did the proceeds of the Liberty bonds involved in this case come into the hands of the receiver so as to permit the establishment of the claim therefor as preferred? As heretofore stated, it may not be disputed that this case presents a trust relationship (*In re Insolvency of Farmers & Merch. Sav. Bank of Mt. Pleasant*, 202 Iowa 859), but this in itself is not sufficient to establish a preferential claim. The right to reclaim a trust fund is predicated on a right in property, and not on the theory of compensation for its loss; although it is not material whether the subject of the trust was in the form of money or other property. It must appear, at least by presumption, that it reached the receiver, so as to increase, in some form, the assets in his possession, from which it may be taken without infringing the rights of creditors. If the proceeds of the bonds went into the assets of the bank, so as to increase its assets and increase the assets going into the hands of the receiver, the

claimants should have a preference. The evidence shows that the two classes of bonds—that is, bonds belonging to the bank and bonds belonging to the claimants—were commingled and sold or hypothecated, and that the proceeds were placed to the credit of the Sanborn bank in the Chicago bank. Clearly, the funds were dissipated. The record fails to show the face or actual value of any of the collateral except the bonds. The augmentation claimed is left wholly to conjecture. *Nelson v. Paxton,* 113 Kan. 394 (214 Pac. 784).

To enforce a preferential claim on the theory of a trust, and to establish the claim against the assets in the hands of a receiver of a bank, the trust funds must be traceable to or serve to augment the assets of the bank to the extent thereof. *Stilson v. First St. Bank,* 152 Iowa 724.

That the Sanborn bank was the bailee of these claimants, and that the relation between it and the claimants was fiduciary in character, must be conceded. It must also be granted that, by reason of such relation, whatever proceeds resulted from the sale or hypothecation of the bonds were stamped with a trust character. In *Leach v. Iowa St. Bank of Atlantic,* 202 Iowa 887, it is said:

"It appears from the evidence that the bank had a considerable number of these bonds of its own. Those of the claimant may have been included by inadvertence. For the purpose of this case, it does not matter whether it was done inadvertently or by evil intent. In either case, the claimant had a right to pursue the proceeds. He could have impressed a trust upon the fund to the credit of the Iowa State Bank in the First National Bank. To that extent, the funds were clearly traced. The burden of proving dissipation would be upon the Iowa State Bank and upon its receiver. No proof of that kind was offered."

In the *Stilson* case, supra (on rehearing), it is said:

"The mere fact that claimant's money should be deemed as received as a trust fund is not sufficient to entitle the claimant to the preference which he asks as against the receiver and against other creditors. * * * [Citing cases.] But it must further appear, by presumption or otherwise, that the trust fund has not been dissipated, but has come into the hands of the receiver, either as a distinct and traceable account or fund,

or as an augmentation of the estate as a whole. In the absence of evidence to the contrary, it will be presumed by a court of equity that a trustee will intentionally preserve a trust fund. If he has commingled the same with his own, and has drawn drafts on the commingled fund, he will be presumed to have drawn first his own funds. *Whitcomb v. Carpenter,* 134 Iowa 227. But the presumption in such a case is a rebuttable presumption of fact, and not a conclusive presumption of law. The crucial point in the case at bar is whether there is such an absence of contrary evidence in this case as to entitle the claimant to such presumption. * * * But can we say, upon this record, that such presumption has not been met by contrary evidence?''

So, here, we see no way to avoid the applicability of the principles stated.

It being conceded, as we do concede, that a trust existed in the first instance, and that the proceeds retained a trust character, has the defendant-receiver met the presumption in favor of the claimants, and established the fact that the trust fund did not pass to the bank or into the hands of the receiver to the augmentation of the assets of the insolvent estate? The presumption arising in favor of the claimants is not conclusive, and may be rebutted by the trustee by proof that the trust fund has been dissipated, and that no part thereof, in any form, ever came into the hands of the receiver. *Hanson v. Roush,* 139 Iowa 58; *Cable v. Iowa St. Sav. Bank,* 197 Iowa 393; *Murray v. North Liberty Sav. Bank,* 196 Iowa 729.

In *City of New Hampton v. Leach,* 201 Iowa 316, it is said:

''If a trust fund is established, a presumption arises that it was retained in the possession of the trustee and came into the hands of the receiver, and the burden is upon the receiver to overcome this presumption.''

We are satisfied that, under the facts of the instant case, the defendant has overcome the presumption. The funds had been dissipated. All that the receiver secured from Chicago was a small amount of notes held by the Chicago bank as collateral security. These were customers' notes for money borrowed at Sanborn from the funds in the bank at Sanborn. These notes are dated within a year prior to the failure of the bank, and long after the Liberty bonds had been sent to Chicago.

The presumption exists that the cashier of the Sanborn bank did not loan trust funds. He had no legal right thereto.

Every bank failure is a tragedy, especially so when the cause is traceable to dishonesty and breach of a known duty. It generally results in financial loss, and affords a sufficient basis for sympathy to the innocent party. Neither curative acts by legislature nor criticism by the courts give to the losers the relief desired and prayed, but neither legislature nor court can instill into the hearts of men that honesty and integrity which should characterize and motivate the acts of bank officials. There must be uniformity of legal principle in cases of this character. Conditions, not theories, must control; and, if relief fails, as it does in this case, it may not be charged to applicable legal principle.

The decree entered by the trial court is—*Affirmed.*

EVANS, C. J., and ALBERT and MORLING, JJ., concur.